CATERPILLAR INC., Plaintiff,

v.

JERRYCO FOOTWEAR, INC., Cadco Imports, Inc., Rugged Footwear Company, Gerald Werman, Jerry Glicksman, and Jonathan Werman, Defendants.

No. 93–1506.

United States District Court, C.D. Illinois.

Nov. 17, 1994.

<hr />

Daniel L. Johns, Seth M. Dabney, III, Westervelt Johnson Nicoll & Keller, Peoria, IL, James W. Dabney, Ronald M. Daignault, Jacqueline M. Lesser, Pennie & Edmonds, New York City, Stephen Janda, Caterpillar, Inc., Peoria, IL, for Caterpillar, Inc.

Dean B. Rhoads, Sutkowski & Washkuhn Ltd., Peoria, IL, William O'Brien, Kronish Lieb Weiner & Hellman, New York City, for Jerryco Footwear, Inc.

Jerryco Footwear, Inc., Atlantic Beach, NY, pro se.

Dean B. Rhoads, Sutkowski & Washkuhn, Ltd., Peoria, IL, William O'Brien, Kronish Lieb Weiner & Hellman, New York City, for Gerald Werman.

Gerald Werman, Atlantic Beach, NY, pro se.

Dean B. Rhoads, Sutkowski & Washkuhn, Ltd., Arthur J. Inman, Peoria, IL, William O'Brien, Kronish Lieb Weiner & Hellman, New York City, for Jerry Glicksman.

Daniel G. O'Day, Cusack & Fleming, Peoria, IL, Andrew D. Schau, Robert L. Lobue, Patterson Belknap Webb Tyler, New York City, for Rugged Footwear Co., Jonathan Werman.

Thomas L. Perkins, Quinn Johnston Henderson & Pretorius, Peoria, IL, for Cadco Imports, Inc.

## ORDER

MIHM, Chief Judge.

This matter is before the Court for decision following the September 16 and 26, 1994 evidentiary hearings on Rugged Footwear Company's and Jonathan Werman's Motion to Vacate or Modify the Court's Preliminary Injunction Order entered September 2, 1994. Rugged's and J. Werman's Motion to Vacate or Modify the Court's Preliminary Injunction Order (# 55) is DENIED. In rendering this decision, the Court has considered the testimony of the witnesses, the documents admitted into evidence, argument by counsel, Rugged and J. Werman's Proposed Findings of Fact, and Caterpillar Inc.'s Proposed Findings of Fact and Conclusions of Law. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court's findings of fact and conclusions of law are set forth below. These Findings supplement the oral Findings made by the Court in open Court on September 26, 1994. These Findings are based solely on the evidence presented at the evidentiary hearings on this matter, and do not in any way prohibit or limit the Court from making different findings based on evidence which is presented at a trial on the merits.

### FINDINGS OF FACT

1. Plaintiff Caterpillar ("CAT") is a Delaware corporation, with its principal place of business in Peoria, Illinois.

2. Defendant Jerryco Footwear, Inc. ("Jerryco") is a New York corporation, with its principal place of business formerly in Island Park, New York (Pltf.Ex. 13) and currently in Atlantic Beach, New York (Pltf.Ex. 37).

3. Defendant Cadco Imports, Inc. ("Cadco") is a Florida corporation, with its principal place of business in Lighthouse Point, Florida (Pltf.Ex. 66).

4. Defendant Rugged Footwear Company ("Rugged") is a Florida corporation, with its principal place of business in Lighthouse Point, Florida (Pltf.Ex. 48) in the same offices as defendant Cadco (Sept. 16 Tr. 83).

5. Defendant Gerald Werman ("Werman") is or was a resident of the State of New York. At relevant times herein defendant Werman was the President and Chief Executive Officer of defendants Jerryco and Cadco (Pltf.Exs. 19, 28, 32, 33, 66; Sept. 26 Tr. 183–84). At relevant times herein defendant Werman is or was also held out as the President and Chief Executive Officer of defendant Rugged (Pltf.Ex. 32). At relevant times herein defendant Werman owned 100% of defendant Jerryco's capital stock and owned 50% of Cadco's and Rugged's capital stock (Pltf.Ex. 37). Werman is or was one of two directors of Cadco (Pltf.Ex. 66).

6. Defendant Jonathan Werman ("J. Werman") is a resident of the State of Florida. Between September 1988 and July 1992, J. Werman was Vice President of defendant Jerryco (Pltf.Exs. 1, 32). J. Werman was Vice President of defendant Cadco from and after July 1992 (Pltf.Exs. 1, 32, 66; Declaration of Jonathan Werman, sworn to September 12, 1994 ("J. Werman Decl.") ¶ 1). In May 1993, J. Werman was held out to CAT as Vice President of defendant Rugged (Pltf.Exs. 28, 32; Sept. 26 Tr. 183–84), but he now claims to be the President of Rugged

(Sept. 16 Tr. 15; J. Werman Decl. ¶ 1). At relevant times herein J. Werman owned 50% of defendants Cadco's and Rugged's capital stock (J. Werman Decl. ¶¶ 13, 22). Defendant Werman is a first cousin of defendant J. Werman's father (J. Werman Decl. ¶ 9). J. Werman is or was one of two directors of Cadco (Pltf. 66).

7. Defendants Werman and J. Werman are each directors of and each own 50% of the capital stock of a Rugged subsidiary in London, England which was incorporated in February 1994, after the commencement of the this lawsuit (Sept. 16 Tr. 94–95; Pltf.Ex. 40). A Canadian subsidiary of Rugged which is wholly owned by Rugged Footwear U.S.A. was also formed since the commencement of this action. (Sept. 16 Tr. 94–95; Sept. 26 Tr. 27).

8. Defendants Werman and J. Werman own 50% of a Taiwanese entity, Nova International, which Werman and J. Werman used to make sales of CAT footwear in certain Asian markets (Sept. 16 Tr. 94; Pltf.Ex. 37; Sept 26 Tr. 54).

9. Defendants Werman and J. Werman were also directors of a Delaware corporation named Cadco Imports, Inc. (Pltf.Ex. 12; Sept 16 Tr. 51). In June 1994, J. Werman was President of a Delaware corporation named Rugged Footwear Company, Inc. (Pltf.Exs. 39, 46) whose office is in defendant Werman's residence (Pltf.Ex. 46; Sept. 26 Tr. 103). Rugged of Delaware was incorporated in May 1993 (Pltf.Ex. 39).

10. Werman and J. Werman have offered no explanation for their use of dual corporate entities having identical corporate names.

11. Defendant Jerry Glicksman ("Glicksman") is or was a resident of the state of New York. In May 1993, defendant Glicksman was held out to CAT as an officer of defendant Jerryco (Pltf.Exs. 28, 32; Sept. 26 Tr. 183–84).

12. In June 1988, CAT entered into a written 5–year license agreement with defendant Jerryco (the "License"), under which Jerryco was granted an "exclusive, personal and nontransferable license to use" certain CAT trademarks on work boots and certain other footwear (Pltf.Ex. 61 § 2.1).

13. Under the License, Jerryco agreed to pay CAT specified percentage royalties on Jerryco's sales of footwear bearing licensed CAT trademarks or trade dress. Jerryco further agreed to provide certified reports of Licensed Articles sold or otherwise disposed of by Jerryco and to maintain accurate and complete records showing in reasonable detail all pertinent information with respect to Licensed Articles sold by Jerryco. (Pltf.Ex. 61 §§ 3–4). The License contemplated Jerryco sales of Licensed Articles to subsidiaries, associated or affiliated companies, or agencies (Pltf.Ex. 61 § 1.3).

14. Between 1988 and December 1993, defendants Werman and Glicksman signed and caused defendant Jerryco to transmit to CAT periodically, through interstate mail and wire communications, royalty statements purporting to show Jerryco's sales of licensed articles and royalties due CAT under the license (Declaration of Bruce R. Wiegand, sworn to August 21, 1994 ("Wiegand Decl.") ¶¶ 3, 11; Pltf.Ex. 11). In fact, the royalty statements sent to CAT repeatedly and significantly understated the sales of licensed articles made by Jerryco or its affiliated, associated or related companies (Pltf.Ex. 53).

15. Between 1988 and January 1994, defendants Werman and Glicksman caused defendant Jerryco to report to CAT total sales of $28,295,897 (Pltf.Ex. 50). However, documents produced by defendants in discovery indicate that the defendants' actual sales of Licensed Articles during this period was $82,236,735 (Pltf.Ex. 50). The underreporting of $53.9 million in CAT footwear sales was the cumulative result of at least eighteen false royalty statements transmitted to CAT quarterly between October 4, 1989 and January 4, 1994 (Pltf.Exs. 53, 11) by means of U.S. mail or interstate wire communications (Wiegand Decl. ¶ 3).

16. As a direct and proximate result of the false royalty statements sent to CAT, more than $2.7 million in royalties owed to CAT under the License was diverted by defendants (Pltf.Ex. 56). Based on all of the evidence, including the completely noncredible testimony of defendant J. Werman (Sept. 26 Tr. 212–213), the Court finds for purposes

of this motion that CAT's loss was caused intentionally by the defendants, and was the intended result of a conspiracy among the defendants to defraud CAT and to conduct the operations of Jerryco through a pattern of racketeering activity, i.e., repeated acts of mail and wire fraud committed over a period of four years.

17. The defendants each committed a variety of intentional acts which concealed from CAT the true volume of the defendants' sales of CAT footwear, and enabled the defendants to "skim" monies owed CAT and avoid paying royalties to CAT. These acts included (a) preparing and transmitting royalty reports to CAT which were false and were known to be false when made; (b) creating fake, made-up documents purporting to be records of CAT footwear sales, which omitted the true volume of the defendants' sales (Pltf.Ex. 5); (c) creating fake, made-up documents purporting to be invoices corresponding to the fake accounting records mentioned above (Pltf.Ex. 4); (d) presenting CAT auditors with fake, made-up documents purporting to be invoices and accounting records showing all sales of CAT footwear subject to royalty, but which in fact omitted tens of millions in sales made by Jerryco and Cadco (Aug. 31 Tr. 60–65; Pltf.Exs. 8, 50); (e) forming and using defendant Cadco to make and invoice sales of CAT footwear (Pltf.Ex. 51) while not recording those sales on any books maintained by any defendant (Sept. 26 Tr. 52–53, 122) and concealing all such sales from CAT (Aug. 31 Tr. 41–42); (f) affirmatively misrepresenting to CAT that sales made through Cadco were included in the fake accounting records submitted to CAT auditors (Pltf.Ex. 33); (g) forming and using a Taiwanese entity, Nova International, to make and invoice sales of CAT footwear while not recording those sales on any books maintained by any defendant (Sept. 16 Tr. 94; Sept 26 Tr. 55, 125, 131; Pltf.Ex. 50) and concealing all such sales from CAT (Sept. 25 Tr. 125–26); (h) forming and using defendant Rugged to make and invoice sales of CAT footwear (Pltf.Ex. 52) while not recording those sales on any books maintained by any defendant (Sept. 26 Tr. 125) and concealing all such sales from CAT (Sept. 26 Tr. 130–31); (i) on the few sales that defendants did report to CAT, skimming 15% of the gross prices paid by the purchasers (Pltf.Ex. 45) and recording the sales at 85% of their actual amount (Sept. 26 Tr. 170–72); and (j) presenting CAT with forecasts of "increased" CAT footwear sales in 1993 (Pltf.Ex. 28; Sept. 26 Tr. 183) which in fact were substantially less than the CAT footwear sales volume which defendants, including J. Werman, knew had been made by Jerryco and Cadco in 1992 (Pltf.Ex. 1).

18. In September 1993, in accordance with Section 4.3 of License, CAT notified Jerryco that CAT would be conducting an audit of Jerryco's records (Wiegand Decl. ¶ 4). Defendant J. Werman was aware of the September 1993 audit (Sept. 16 Tr. 75). Two CAT internal auditors, Michael E. Fairfield and Dale E. Brooks, visited Jerryco's then-corporate offices in Island Park, New York, on September 21 and 22, 1993 (Aug. 31 Tr. 60). Fairfield and Brooks met with defendant Glicksman and Ms. Leah Wohlgemuth (Aug. 31 Tr. 60). Wohlgemuth was the business manager of Jerryco, Cadco, and Rugged (Pltf. 32).

19. Mr. Fairfield asked Glicksman and Wohlgemuth to provide records substantiating the immediately preceding year's sales of CAT footwear (Aug. 31 Tr. 60–61). Fairfield and Brooks were then presented with six three-ring binders containing computer generated copies of documents purporting to be sales invoices dating back to 1989 (Aug. 31 Tr. 61). Plaintiff's Exhibit 4 was admitted as an example of one of these invoices.

20. The CAT auditors were suspicious of the purported invoices because they appeared to have been recently generated at the same time (Aug. 31 Tr. 61). In addition, while the total number of sales reported on the invoices bore a rough correspondence to the total number of sales that Jerryco had reported to CAT between 1988 and June 30, 1993 (Pltf. 8), discrepancies existed between the amounts in the invoices presented and the quarterly amounts Jerryco had reported to CAT (Aug. 31 Tr. 64–65). When asked to explain the discrepancies, defendant Glicksman told the CAT auditors that the royalty reports had been prepared "on a manual

basis" and that "he must have made some mistakes" (Aug. 31 Tr. 65).

21. The CAT auditors requested substantiation to tie the purported invoices into a general ledger or other record of sales and accounts receivable (Aug. 31 Tr. 62). After numerous conversations with Jerryco's accountant, Mr. Will Dillard (Aug. 31 Tr. 63), defendant Werman transmitted to CAT, by U.S. mail (Aug. 31 Tr. 64), a document purporting to be a sales journal of CAT footwear sales subject to royalty. (Aug. 31 Tr. 63–64). An excerpt of this purported sales journal was admitted as Plaintiff's Exhibit 5.

22. Defendant Werman thereafter sent by mail or interstate wire transmission (Sept. 26 Tr. 178) a letter dated October 20, 1993 stating that Jerryco had provided all "needed documentation" regarding the audit and he thought "everything was clear and in order." (Pltf.Ex. 33). Werman also stated that Cadco invoices to non-USA customers "appear and are listed" in the same manner as Walmart and other USA customers in the purported sales journal sent by Werman to CAT. Defendant J. Werman saw Werman's letter and agreed with its contents (Sept. 16 Tr. 102–103).

23. In fact, the invoices which Glicksman and Wohlgemuth presented to CAT auditors in September 1993 (Pltf.Ex. 4) and the journal which defendant Werman subsequently sent to CAT (Pltf. 5), were fakes which omitted the vast majority of CAT footwear sales that defendants had made since 1988 (Pltf.Ex. 8) and which clearly had been made up for the purpose of deceiving and defrauding CAT (Aug. 31 Tr. 43–50; Pltf.Exs. 4–8).

24. In late October 1993, CAT became aware of defendants' skimming scheme when it independently discovered an application for U.S. registration of a trademark which Cadco had filed on certain CAT trade dress. In that application, J. Werman disclosed, under oath, the existence of much larger sales than had previously been disclosed to CAT (Wiegand Decl. ¶ 5; Pltf.Ex. 1).

25. Following its discovery of the Cadco trademark application, CAT immediately demanded from Jerryco an explanation of the discrepancy between the sales volumes which Jerryco had reported to CAT and the sales volumes which Jerryco's related company, Cadco, had reported to the U.S. Government (Wiegand Decl. ¶ 6). When no explanation was forthcoming, CAT commenced this action on November 24, 1993 (Wiegand Decl. ¶ 6). The License expired on December 31, 1993 (Pltf.Ex. 55).

26. CAT's initial complaint named Jerryco, Cadco, Werman, and Glicksman as defendants. Rugged and J. Werman were not initially named as defendants.

27. Beginning at the time of CAT's audit of Jerryco in September 1993 and continuing through the entry of the Temporary Restraining Order entered by the Court on August 21, 1994, the defendants took a series of secret and fraudulent steps designed to render Jerryco and Cadco judgment proof and to frustrate enforcement of any judgment of the Court.

28. J. Werman admitted to being aware of the September 1993 audit of Jerryco (Sept. 16 Tr. 75) and knew by not later than November 1993 that CAT was claiming substantial amounts due from defendant Cadco (Sept. 16 Tr. 75–76).

29. Beginning in December 1993, the defendants began using Rugged, not then named as a defendant, to invoice customers for sales that had in reality been made by defendant Cadco (Sept. 26 Tr. 121–124; Pltf. Exs. 51, 52). Defendant Werman began using Rugged letterhead to correspond with customers who had previously dealt with Cadco (Pltf.Ex. 22).

30. In the early part of 1994, defendants Werman and J. Werman caused all of the employees and assets of Cadco to be transferred to Rugged (Sept. 16, Tr. 83–84; Pltf. Exs. 23, 35; Sept. 26 Tr. 55–62); Declaration of James W. Dabney, sworn to August 21, 1994 ("Dabney Decl."). The transfers included more than $800,000.00 in cash. (Pltf.Ex. 35). Although these funds were accounted for on Cadco's books as a loan receivable and on Rugged's books as a liability (Koh Decl. ¶¶ 16–18), the monies were transferred without any written loan agreement (Sept. 16 Tr. 107), interest, collateral, or any other indicia of a bona fide transaction (Sept. 26 Tr. 24,

55–57, 59, 90–91). These monies were used by Rugged to purchase inventory and meet other operational expenses (Koh Decl. ¶ 16).

31. There were 16 "repayments" from Rugged to Cadco between February 1994 and August 1994, for a total exceeding $317,-000.00. However, some of the "repayments" were immediately distributed by Cadco to Werman and J. Werman as salary even though they were not doing any work for Cadco (Sept. 26 Tr. 92–93). In addition, Rugged accounted for its rent payments and other business expenses as "repayments" of the Cadco loan (Pltf.Ex. 35).

32. Rugged realized loses in each month from May through September 1993, February 1994, and substantial losses in each month from April 1994 through July 1994 (Sept 26 Tr. 112–113; Pltf.Ex. 49). In June 1994, Rugged could not borrow money from a financial institution without personal guarantees from Werman and J. Werman (Sept. 26 Tr. 106; Pltf.Ex. 47). In May 1994, Werman granted a Florida bank a security interest in the assets transferred from Cadco to Rugged for present and future advances (Pltf.Ex. 48).

33. Defendant Jerryco has also been shut down subsequent to the commencement of this action (Decl. of William P. Callahan, sworn to August 22, 1994 ("Callahan Decl.") ¶¶ 2–3). CAT has been unable to locate the individuals who were employed by Jerryco (Pltf. 32). The former Jerryco offices were abandoned (Callahan Decl.) and its assets transferred to a location as yet unknown.

34. The defendants gave no indication to CAT or the Court that Jerryco and Cadco had become defunct corporate shells. Defendants' bank records obtained by CAT in August 1994 revealed that the Jerryco and Cadco entities had been abandoned and drained of assets and employees. Evidence also indicates that defendant Glicksman was preparing to move to Florida and defendant Werman was preparing to move to Israel (Callahan Decl. ¶ 4; Pltf.Exs. 9, 10).

35. Upon discovering this, CAT filed an Ex Parte Motion for Temporary Restraining Order under the Illinois Fraudulent Transfer Act, 740 ILCS 160/8. The Court granted that motion by Order entered August 22, 1994 and set a preliminary injunction hearing for August 31, 1994.

36. On August 25, 1994, CAT filed a motion for leave to amend its complaint to name J. Werman and Rugged as additional defendants and to assert claims against them for, among other things, fraudulent transfers under the Illinois Fraudulent Transfer Act. J. Werman was immediately made aware of the claims against him and the Court's TRO (Sept. 16 Tr. 47).

37. On August 31, 1994, the Court held an evidentiary hearing on whether a preliminary injunction should enter under the Illinois Fraudulent Transfer Act. The original defendants and Rugged appeared through counsel but offered no evidence (Aug. 31. Tr. 16).

38. On September 2, 1994, the Court entered a Preliminary Injunction Order under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/8 (Doc. # 52). The Preliminary Injunction Order restrained the defendants from making fraudulent transfers of assets, but left the defendants in possession of this property and allowed Werman and J. Werman to carry on their ordinary business through Rugged. The Preliminary Injunction Order further allowed CAT leave to amend its complaint to name Rugged and J. Werman as additional defendants.

39. On September 8, 1994, the law firm which had represented the original defendants and Rugged since the commencement of this action, moved to withdraw as counsel based on a conflict of interest. New counsel appeared for defendants Rugged and J. Werman and moved to vacate or modify the Preliminary Injunction Order as to Rugged and J. Werman. Rugged's and J. Werman's new counsel claimed that Rugged's and Cadco's former counsel had not presented evidence of money transfers from Cadco to Jerryco because of an alleged conflict of interest (Sept. 16 Tr. 29). The Court was not made aware of any conflict of interest at the Preliminary Injunction hearing (Sept. 16 Tr. 29). In fact, on September 1, 1994, in a telephone conference with the Court, the original defendants and Rugged, through their then counsel, suggested that they could produce evidence that certain funds were shifted from

Cadco bank accounts to Jerryco bank accounts.

40. On September 16 and 24, 1994, the Court held evidentiary hearings on Rugged's and J. Werman's motion to vacate or modify the Court's Preliminary Injunction Order. Defendants Werman and Glicksman failed to appear or testify at either hearing.

## CONCLUSIONS OF LAW

41. The Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1121, 18 U.S.C. § 1964(a), 28 U.S.C. §§ 1331, 1332(a), and 1367.

■ 42. Defendants Jerryco, Cadco, Gerald Werman, and Jerry Glicksman waived any objection to personal jurisdiction by filing a motion under Fed.R.Civ.P. 12(b) on February 7, 1994 which omitted any objection to personal jurisdiction. Fed.R.Civ.P. 12(h); *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1296 (7th Cir.1993).

■ 43. Rugged and J. Werman were served with summonses and CAT's Second Amended and Supplemental Complaint on September 16, 1994. The Court has jurisdiction over the persons of defendants Rugged and J. Werman under 18 U.S.C. § 1965(d) and the doctrine of pendent personal jurisdiction. *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056–57 (2nd Cir. 1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Rice v. Nova Biomedical Corp.*, 763 F.Supp. 961, 966 (N.D.Ill.1991).

■ 44. The Court has jurisdiction over the persons of defendants J. Werman and Rugged under 735 ILCS 5/2–209 which is coextensive with the Due Process Clause of the Fourteenth Amendment. J. Werman and Rugged purposefully directed their activities at CAT, a resident of this district. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). The assertion of jurisdiction here would comport with fair play and substantial justice. *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945)).

45. J. Werman and Rugged have been aware of and have participated in this litigation since its commencement. (Sept. 16 Tr. 46). Rugged was bound by a stipulated injunction entered by the Court on December 28, 1993 in this case (Pltf.Ex. 55). J. Werman instructed his counsel to move for relief from the temporary restraining order on August 24, 1994 and oppose CAT's motion for preliminary injunction at the August 31, 1994 hearing (Sept. 16 Tr. 47–48). J. Werman and Rugged appeared and gave evidence at two hearings on September 16 and 26, 1994 on their motion to vacate or modify the Court's preliminary injunction order.

■ 46. In addition to their own purposeful acts directed at CAT, an Illinois resident, Rugged and J. Werman are subject to personal jurisdiction in this Court as co-conspirators with the originally named defendants. *Davis v. A & J Electronics*, 792 F.2d 74, 76 (7th Cir.1986); *Textor v. Board of Regents*, 711 F.2d 1387, 1392–93 (7th Cir.1983); *Markarian v. Garoogian*, 767 F.Supp. 173, 178 (N.D.Ill.1991).

■ 47. The Court's decision to grant or deny preliminary injunctive relief is guided by consideration of the following four factors:

(1) Whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not enter;

(2) Whether the threatened injury to the plaintiff outweighs the threatened injury the injunction may inflict on the defendant;

(3) Whether the plaintiff has at least a reasonable likelihood of success on the merits; and

(4) Whether the granting of a preliminary injunction will disserve the public interest.

*Wesley–Jessen Div. of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 864 (7th Cir.1983); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992); *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 906 (7th Cir.1986).

### Irreparable Harm to CAT

■ 48. CAT demonstrated a likelihood of success on the merits of claims against the defendants, jointly and severally, for fraud and civil RICO violations which caused com-

pensatory damages to CAT of at least $2.76 million (Aug. 31 Tr. 40–51; Sept. 26 Tr. 125–132; Pltf.Exs. 3–8, 52–56). With trebling under RICO and prejudgment interest the judgment would likely exceed $8,000,000. In addition, CAT has statutory (18 U.S.C. § 1964(c)) and contractual claims for attorneys' fees (Pltf Ex. 61 § 4.4).

49. CAT has further established a likelihood of success on the merits of claims that the defendants have each transferred or received transfers of assets, directly and indirectly, with specific intent to defraud CAT and to frustrate enforcement of any judgment in this case. The record establishes that the defendants have committed premeditated, fraudulent, bad faith acts and have given false testimony in proceedings before the Court.

50. Considering the defendants' past intentionally deceptive, bad faith acts, the Court finds that there is a high probability that, absent a preliminary injunction, the defendants would engage in further acts designed to defraud CAT and frustrate enforcement of any judgment the Court might enter. This is a form of irreparable harm warranting preliminary injunction relief. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984) (irreparable harm may exist where defendant may become insolvent before a final judgment can be collected); *Federal Trade Commission v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir.1988) (freezing defendants assets upheld where assets had been shifted from closely-held corporate defendant to individuals who were sole shareholders of corporate defendant).

### Balancing the Relative Harms

51. The defendants offered no credible evidence showing that the Preliminary Injunction was causing any material or irreparable harm to the defendants. The Preliminary Injunction leaves the defendants in possession of their property and merely establishes controls to prevent fraudulent transfers of assets. The injunction has been tailored at the defendants' suggestions to enable defendants to carry on their ordinary business subject only to reasonable safeguards.

52. Only defendants J. Werman and Rugged have claimed harm from or sought to vacate the Preliminary Injunction. The only pecuniary injury claimed by J. Werman and Rugged is a negative impact on Rugged's ability to increase a $250,000 bank credit line (Pltf.Ex. 48) which Werman, J. Werman, and their spouses personally guaranteed (Sept 26 Tr. 106–07; Pltf Ex. 47). J. Werman and Rugged did not offer any evidence from the bank supporting the asserted impact of the Preliminary Injunction on Rugged's ability to obtain credit.

53. In his declaration, J. Werman claimed that he "expected approval for an increase of $100,000 in September and the full $1 million by year end 1994" (J. Werman Decl. ¶ 29). The Court rejects J. Werman's expectation as incredible. J. Werman concealed this litigation from the bank and CAT's large claim against defendants including Rugged's guarantor (Pltf.Ex. 47) and 50% owner, Werman, for fraud and civil RICO violations (Sept. 26 Tr. 107). J. Werman's claim that the Preliminary Injunction has negatively impacted Rugged's ability to borrow money is rejected as unsupported by any evidence. The Court finds that the difficulties Rugged claims to be facing now are not materially different than those Rugged would face if it were not subject to the Preliminary Injunction and disclosed to potential lenders the fact that it and its personal guarantors are defendants in a multi-million dollar lawsuit alleging fraud and dishonesty (Sept. 26 Tr. 107).

54. As further evidence that the Preliminary Injunction will not have any effect on Rugged's ability to increase its credit line, Rugged experienced substantial losses in each month between March and July 1994 (Sept. 26 Tr. 113; Pltf.Ex. 49). Rugged's net worth on July 31, 1994 was negative $301,-633.96 (Pltf.Ex. 42, 49). Further, Werman and J. Werman were both required to give personal guarantees before the bank would lend any money to Rugged (Pltf. 47; Sept. 26 Tr. 106).

55. In response to the Preliminary Injunction Order, Rugged employee Lawrence Koh prepared financial statements based on

Rugged's existing business records showing that Rugged on July 31, 1994, had a negative net worth of $301,633.96 (Pltf.Ex. 42). That negative net worth figure counted as "assets" the sum of $77,000.00 in start-up expenses having no real value (Sept. 26 Tr. 117) and a "receivable" due from an affiliated company co-owned by Werman and J. Werman for $532,549,000. This receivable is of unproven value or collectability (Sept. 26 Tr. 70–71, 117–118).

56. After producing these financial statements showing a negative net worth, Mr. Koh, at the request of Rugged's new counsel, prepared a second set of financial statements which re-valued Rugged's inventory at 35% above cost (Sept. 25 Tr. 90). These revised financial statements were clearly made for litigation and are rejected as unreliable. Mr. Koh has no formal training qualifications as an accountant (Sept. 26 Tr. 51). Under generally accepted accounting principle ("GAAP"), inventory is to be valued at the lower of cost or fair market value (Sept. 26 Tr. 116). In view of Rugged's net operating losses in each of the four months prior to July 1994, there is no basis for treating Rugged's inventory at greater than cost or otherwise in accordance with GAAP (Sept. 26 Tr. 115–16).

57. In addition, the Court ordered CAT to post a $500,000 corporate undertaking at the direction of the Court which promises to pay any costs or damages awarded to J. Werman or Rugged by the Court as a result of their having been wrongfully enjoined. This undertaking balances any potential harm to defendants. Further, movants have not cited any caselaw to support their claim that attorneys' fees are recoverable against a preliminary injunction. *Contra Matek v. Murat,* 862 F.2d 720, 734 (9th Cir.1988); *Fireman's Fund Insurance Co. v. S.E.K. Construction Co.,* 436 F.2d 1345, 1351 (10th Cir.1971).

58. The Preliminary Injunction is designed only to prevent further fraudulent transfers while leaving the defendants free to conduct legitimate business. None of the defendants' assets have been attached. The Court has amended the Preliminary Injunction several times since it was granted to minimize its burden on defendants while maintaining the status quo so that CAT's prospects for damages recovery are not diminished by any additional fraudulent assets transfers.

*CAT's Likelihood of Success on the Merits of its Claims*

59. CAT has established a reasonable likelihood of success on the merits of its claims against defendants for fraud, civil RICO violations, and fraudulent transfers.

■ 60. With regard to CAT's RICO claims, defendants Werman, J. Werman, Glicksman, Cadco, and Rugged were each employed by or associated in fact with one or more enterprises, including Jerryco, that were engaged in or whose activities affected United States interstate or foreign commerce. CAT has established the "enterprise" element of its RICO claim. 18 U.S.C. § 1961(4).

61. The evidence now before the Court convincingly demonstrates that Werman, J. Werman, Glicksman, Cadco, and Rugged all conspired together to violate 18 U.S.C. § 1962(c) by conducting or participating in Jerryco's affairs through the commission of multiple racketeering acts. To state a violation of 18 U.S.C. § 1962(d) for RICO conspiracy, CAT must show "that the defendant entered into an agreement with knowledge that the goal of the conspiracy is the commission of the RICO violation, that is to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity." *United States v. Campione,* 942 F.2d 429, 437 (7th Cir.1991) (*quoting United States v. Neapolitan,* 791 F.2d 489, 492 (7th Cir.1986)). Such an agreement "may be inferred from allegations that defendants committed several acts of racketeering in furtherance of the affairs of the enterprise." *Pandick, Inc. v. Rooney,* 632 F.Supp. 1430, 1436 (N.D.Ill. 1986).

62. The affairs of defendant Jerryco were conducted through a pattern of racketeering activity: the repeated interstate mailings and interstate wire transmissions to CAT of at least eighteen false and fraudulent royalty reports over a period of four years. Defen-

dants have not disputed that these acts constitute a "pattern of racketeering activity" under RICO. 18 U.S.C. § 1961(5); *United States v. Robinson,* 8 F.3d 398 (7th Cir.1993) (upholding RICO convictions based on repeated mailings of false royalty statements to trademark licensor); *Liquid Air Corp. v. Rogers,* 834 F.2d 1297 (7th Cir.1987), *cert. denied,* 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989) (affirming RICO civil liability arising out of mailings of false shipping orders).

63. The evidence further shows that Cadco, through at least its President Werman, was a full and knowing participant in a conspiracy to conduct Jerryco's affairs through a pattern of mail and wire fraud. Werman and J. Werman agreed that Cadco would, without CAT's knowledge, begin invoicing sales of footwear subject to the License (Sept. 16 Tr. 68–69), would not record its sales activity on any books maintained by Cadco and would not report its sales to Jerryco (Sept. 16 Tr. 70–73). Werman and J. Werman arranged for additional off-the-books sales to take place by Nova International in the Far East. The Court rejects J. Werman's testimony that he was not aware that samples of NOVA–CAT footwear were made up for sale (Sept. 16 Tr. 95). All of these acts were related to a common purpose and conspiracy of defrauding CAT, were intended to and did deceive CAT, and continued over a period of more than four years. As a result of defendants' actions, CAT suffered *economic injury* of more than $2.7 million, representing underpayments of royalties due under the License.

64. CAT also established a reasonable likelihood of success on the merits of its common law fraud claim against all defendants. "Under Illinois law fraud occurs where a defendant makes a false representation of material fact which defendant knows is false, defendant intends that plaintiff rely on this false representation and plaintiff reasonably relies thereon and sustains damage because of it." *Marc Development, Inc. v. Wolin,* 845 F.Supp. 547, 555 (N.D.Ill.1993); *Dresser Industries, Inc. v. Pyrrhus AG,* 936 F.2d 921, 934 (7th Cir.1991). Defendants knowingly, intentionally, and repeatedly submitted false sales reports to CAT in order to support and conceal Jerryco's underpayment of royalties.

65. Each defendant, not only Jerryco, committed fraud. Eeach defendant, by prior agreement, contributed to the fraud and deception that diverted royalties owed CAT in excess of $2.7 million. In particular, the Cadco entity was used to make sales off Jerryco's books and conceal tens of millions of dollars in CAT footwear sales.

66. CAT reasonably relied on Jerryco's royalty report and therefore, believed that Jerryco was complying with the terms of the License. If CAT had known the truth, it would have undoubtedly taken steps to collect the amounts owned by Jerryco and terminated the License pursuant to its terms. As a result of its reliance, CAT was damaged.

67. CAT has also demonstrated a reasonable likelihood of success on its claim for recovery under the Illinois' Uniform Fraudulent Transfer Act. Defendants have not contested the application of the Illinois version of the Uniform Fraudulent Transfer Act ("UFTA") and have not argued that there is any difference between Florida and Illinois fraudulent transfer law that would change the outcome of the fraudulent transfer issues in this case if Florida law applied. 740 ILCS 160/5 *et seq.;* Fla.Stat. § 726.105 *et seq.* Accordingly, application of Illinois' Uniform Fraudulent Transfer Act is proper. *International Administrators, Inc. v. Life Insurance Co.,* 753 F.2d 1373, 1376 n. 4 (7th Cir.1985); *In re Sevko, Inc.,* 143 B.R. 167, 174 n. 4 (N.D.Ill.1992).

68. 740 ILCS 160/5(a) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor;

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

The transactions between Cadco and Rugged were fraudulent as to CAT.

69. The UFTA defines "debtor" as a person who is liable on a claim. 740 ILCS 160/2(f). " 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 740 ILCS 160/2(c). CAT's original complaint stated a claim against Cadco, as have CAT's subsequent amendments to that complaint. CAT's complaint alleges that Cadco is liable to CAT for fraud and RICO violations and damages in the millions of dollars. Since CAT has stated a valid claim against Cadco, Cadco is a debtor under the UFTA.

70. Defendants caused more than $800,-000 in cash to be transferred from Cadco to Rugged after this lawsuit was commenced (Pltf. 35). The transfers from Cadco to Rugged were fraudulent under 740 ILCS 160/5(a)(1).

71. Many of the factors for determining actual intent to defraud a creditor under paragraph (1) of subsection (a) are met by the Cadco to Rugged transfers. 740 ILCS 160/5(b). "[T]he transfer or obligation was to an insider," and "the debtor retained possession or control of the property transferred after the transfer." 740 ILCS 160/5(b)(1), (2). Cadco and Rugged are each beneficially owned by Gerald Werman and J. Werman (Sept. 26 Tr. 59–60). Mr. Koh, Rugged's controller, testified that he regularly transferred funds from Cadco to Rugged without consulting defendant Werman, since Werman and J. Werman were equal owners of both corporations (Sept. 26 Tr. 91). Werman and J. Werman are each defendants in this case, and Werman was a defendant in this case at the time of the transfers here at issue. The transfers from Cadco benefited the same insiders who owned and controlled both Cadco and Rugged. Cadco retained effective control of the transferred funds, since its sole owners also owned the transferee, Rugged.

72. In addition, "the transfer or obligation was ... concealed" (740 ILCS 160/5(b)(3)) from CAT, since it never was disclosed to CAT and was not public information because Cadco and Rugged are each wholly and privately owned by the same two people.

73. "[B]efore the transfer was made or obligation was incurred, the debtor [Cadco] had been sued" and "the transfer was of substantially all of the debtor's assets." 740 ILCS 160/5(b)(4), (5).

74. Movants also did not convincingly rebut evidence showing that defendants Gerald Werman and Jerry Glicksman were in the process of absconding from New York State, Werman to Israel and Glicksman to Florida (Pltf.Ex. 9, 10; Aug. 31 Tr. 27–30, 68–69). 740 ILCS 160/5(b)(6).

75. Since the amounts transferred represented almost all of Cadco's liquid assets, the transfers to Rugged also appear to have been an attempt by defendants to "remove[ ] or conceal[ ] assets" from CAT. 740 ILCS 160/5(b)(7).

76. The Court rejects J. Werman's testimony that an alleged promise existed between defendants Werman and J. Werman to repay themselves. (Sept. 16 Tr. 107). The alleged promise was not evidenced by any note or other written documentation, and was unaccompanied by any collateral, loan agreement, or provision for interest (Sept. 26 Tr. 56–60). This supports the conclusion that "the value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred." 740 ILCS 160/5(b)(8).

77. Finally, "the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred" since virtually all of Cadco's assets were transferred to Rugged for the purpose of

rendering Cadco judgment proof. 740 ILCS 160/5(b)(9).

78. In addition to the statutory indica of fraudulent intent established by CAT, J. Werman's own testimony supports the conclusion that transfers to Rugged were fraudulent under the UFTA. While testifying, J. Werman became trapped in numerous material inconsistencies and misstatements of fact. Considering these inconsistencies and misstatements of fact together with his demeanor on the witness stand, the Court finds his testimony unbelievable. For example:

(1) J. Werman testified that defendant Gerald Werman played "no role" in the management of either Cadco or Rugged (Sept. 16 Tr. 19). In fact, Gerald Werman was deeply involved in the management of both companies, as shown by contemporaneous correspondence of which J. Werman was aware (Aug. 31 Tr. 35–36; Sept. 16 Tr. 53–54, 60, 66–69, 86–90; Pltf.Exs. 1, 12, 13, 14, 17, 18, 19, 24–28).

(2) J. Werman testified that he held no position with Cadco Imports, Inc. (Delaware) (Sept. 16 Tr. 50). In fact, J. Werman was a director of that company and had the power to sign checks on behalf of that company (Pltf.Ex. 12; Sept. 16 Tr. 51).

(3) J. Werman testified that Cadco's sales activities were periodically reported to defendant Jerryco Footwear, Inc. in the form of "verified statements" (Sept. 16 Tr. 70). In fact, defendant Cadco maintained no such "statements" and never reported its sales to defendant Jerryco (Sept. 16 Tr. 72–73; Sept. 26 Tr. 53–54).

(4) J. Werman testified that the "loan" from Cadco to Rugged had mostly been repaid prior to the institution of this lawsuit (Sept. 16 Tr. 108). In fact, the only material "repayments" occurred after the litigation (Sept. 16 Tr. 112; Pltf.Ex. 35). Many if not all of the "repayments" have taken the form of payments made by Rugged to pay phantom expenses of the defunct Cadco entity (Sept. 26 Tr. 60–61; Pltf.Ex. 41).

(5) J. Werman testified that "under the license agreement" between Jerryco and CAT it was his understanding that it was "impossible" for Cadco to pay royalties directly to CAT (Sept. 16 Tr. 24). He then testified that he had never seen the License (Sept. 16 Tr. 49). Almost immediately, he said that he had seen the License, in connection with an amendment to the License, but could not recall exactly when he saw it (Sept. 16 Tr. 50). Next, J. Werman testified that he saw the License in January of 1992 as an attachment to another license agreement defendant Werman executed with himself (Sept. 16 Tr. 59).

(6) J. Werman first testified that he did not discuss with Werman the contents of a license agreement between Jerryco ·and Cadco Imports, Inc., a Delaware corporation, (Sept. 16 Tr. 57; Pltf.Ex. 13) and then said that he did discuss it with Werman, but that he could not recall any details of any discussions (Sept. 16 Tr. 57).

(7) J. Werman reviewed and agreed with statements in a letter (Pltf.Ex. 33) written by Gerald Werman to CAT describing Gerald Werman's involvement in Cadco (Sept. 16 Tr. 102–103). Only when·guided by his counsel did he retract his testimony and profess his disagreement with those statements (Sept. 16 Tr. 103).

(8) In response to questioning by the Court, J. Werman testified that the interest rate on the "loans" to Rugged were the product of a specific oral agreement between David Werman acting on behalf of Cadco and Larry Koh acting on behalf of Rugged (Tr. 107). In addition, J. Werman stated that the interest rate on the "loans" was a "fair market" rate that "may have been 1 percent per month" (Sept. 16 Tr. 106–07). In fact, Rugged paid no interest on the transfers from Cadco (Sept. 26 Tr. 24), and there was no negotiation of terms (Sept. 26 Tr. 56, 59).

(9) J. Werman testified that Rugged, unlike Cadco, is an "in-stock" business, buying and warehousing inventory for sale directly to retailers (Sept. 16 Tr. 36–37). That testimony is directly contradicted by a letter J. Werman wrote five days later which indicates that Rugged is also doing volume business formerly conducted by Cadco (Pltf.Ex. 44; Sept. 26 Tr. 80–81).

(10) J. Werman estimated Rugged's net worth to be "about $2.5 million" (Sept. 16 Tr. 104). In fact, Rugged had a negative net worth as of July 31, 1994 of about $300,000 (Pltf.Exs. 42, 49).

79. Werman and J. Werman's attempt to repay the "loan" they had made to themselves is further evidence of the fraudulent character of Cadco's transfers to Rugged. Although Cadco was made defunct in March 1994 (Sept. 16 Tr. 106) and all of its employees and assets gratuitously transferred to Rugged (Sept. 16 Tr. 83–86), Werman and J. Werman stayed on Cadco's payroll and were kept off Rugged's payroll, even though they were performing no services for Cadco but were in fact working for Rugged (Sept. 26 Tr. 92–93, 98). Werman and J. Werman caused Rugged to transfer cash to Cadco accounts, which transfers were immediately distributed as supposed salary from Cadco to Werman and J. Werman (Sept. 26 Tr. 92). These transfers were recorded as asserted repayments of a "loan" from Cadco to Rugged (Pltf.Ex. 35; Sept. 26 Tr. 92). This characterization was fraudulent. Similarly, the scheme whereby Rugged accounted for its rent payments and other routine business expenses as "repayments" of a "loan" from Cadco (Pltf.Ex. 35) on the basis that Rugged was occupying the same space that had been leased by the defunct Cadco entity was also fraudulent.

80. Subsequent to the commencement of this action, defendants Werman and Glicksman secretly abandoned the Jerryco enterprise and stripped it of employees, assets, and offices. Glicksman put his house up for sale and made plans to move to Florida (Aug. 31 Tr. 29–30, 68–69; Pltf.Exs. 9, 10; Callahan Decl. ¶ 4). Glicksman then submitted a carefully worded sworn declaration which falsely implied that he was not preparing to abscond to Florida.

81. The Jerryco corporate premises were abandoned in August 1994 (Callahan Decl. ¶¶ 2–4). Defendants have offered no explanation for the shutdown of Jerryco or Cadco or any explanation of why defendants Werman and J. Werman could not have continued to do business using those corporate entities. Defendants have thus far concealed the transfer location of Jerryco's records, employees, and other business assets. Defendants' abandonment of Jerryco and Cadco and their concealment of assets is indicative of fraudulent intent.

82. Rugged now sells footwear on an in-stock and volume basis to customers in the United States, just as Jerryco did, and on a volume basis to customers outside the United States, just as Cadco did (Sept 26 Tr. 78–82; Pltf.Ex. 44). The fact that defendants chose to continue their footwear sales business through Rugged rather than Cadco illustrates defendants' knowledge of Cadco's impending liability to CAT and lends additional support to the conclusion that the transfers to Rugged were intended to be fraudulent.

83. In addition to satisfying 740 ILCS 160/5(a)(1), Cadco's transfers also satisfy 740 ILCS 160/5(a)(2). First, the transfers were not for a "reasonably equivalent value in exchange" (740 ILCS 160/5(a)(2)) since Rugged's alleged oral promise to repay the "loan" at 0% interest was not shown to have any market value or negotiability. Second, the transfers left Cadco with "unreasonably small" remaining assets in relation to the transaction (740 ILCS 160/5(a)(2)(A)). After the majority of the transfers had occurred, Rugged, not Cadco, met Cadco's ongoing obligations—its office lease, its equipment and auto leases, and the salary due its remaining employees—which remained after the transfer were made. Rugged assumed Cadco's obligations and paid them by making payments to Cadco. There is no indication that Rugged voluntarily assumed Cadco's potential liability to CAT in connection this lawsuit. In addition, the transfers to Rugged were made at a time when Cadco "reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due" (740 ILCS 160/5(a)(2)(B)) since defendants knew of CAT's claims against Cadco and the likelihood that a judgment would be entered in CAT's favor.

84. Thus, under either UFTA test—actual fraud or constructive fraud—Cadco's transfers to Rugged were fraudulent. 740 ILCS 160/5.

85. CAT has established a reasonable likelihood of success on the merits of its RICO, common law fraud, and fraudulent transfer claims. CAT's additional claims need not be considered at this time in connection with the Preliminary Injunction Order. See Second Amended and Supplemental Complaint.

### The Public Interest

86. Finally, the Court must consider the public interest in determining whether the vacate or modify the Preliminary Injunction. The public has an interest in seeing that parties that enter into commercial agreements honor those agreements and be held accountable when they fraudulently seek to evade judgment of the Court.

### Rugged's and J. Werman's Legal Argument

87. J. Werman's and Rugged's legal argument against the Preliminary Injunction is that Cadco is not a "debtor" to CAT within the meaning of 740 ILCS § 160/5 because it allegedly paid or caused to be paid to Jerryco certain monies in connection with sales made by Cadco. The Court rejects this argument.

88. Cadco is charged as a joint tortfeasor for fraud and civil RICO violations. Cadco's alleged payment to Jerryco of royalties due CAT did not absolve Cadco of joint and several liability to CAT for damages caused by fraud which Cadco committed and conspired to commit against CAT through its President, director, and 50% owner, Werman. Werman's knowledge of the fraud is imputed to Cadco as a matter of law. *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 438 (7th Cir.1980) (citing Illinois law).

89. The Court rejects J. Werman's testimony that Werman supposedly had no role in management of Cadco (Sept. 16 Tr. 19). That testimony was contradicted by all contemporaneous evidence (Pltf.Exs. 1, 12, 13, 14, 17, 18, 19, 24–28, 32, 33, 38). J. Werman was fully aware of Gerald Werman's role in Cadco and drafted Cadco correspondence which was either signed by Gerald Werman or attributed to Werman and sent to CAT (Sept. 16 Tr. 62–63, 65–69, 80–81, 86–90, 102–103; Pltf.Exs. 17, 19, 20, 24, 25, 26, 27, 28,

33). Gerald Werman had the authority to sign checks on behalf of Cadco, and did so (Sept. 16 Tr. 66–67; Pltf.Exs. 18, 34).

90. The Court further rejects, as without foundation, the testimony of Rugged witness Koh that Werman had no role in managing the financial affairs of Cadco and Rugged (Sept. 26 Tr. 16). Koh was hired in December 1993 and only started working at Cadco's office in January 1994 (Sept. 16 Tr. 50). Koh admitted to having no knowledge of how Werman and J. Werman arranged their business affairs before December, 1993 (Sept. 26 Tr. 63). Koh was not even told about this lawsuit prior to the Court's TRO (Sept. 26 Tr. 108).

91. In addition to the fraudulent acts which Werman caused Cadco to perpetrate and facilitate, J. Werman structured Cadco's operation to ensure that sales made by Cadco would go unrecorded and unreported to CAT. Contrary to J. Werman's testimony (Sept. 16 Tr. 70), the record shows that Cadco maintained no ledger or journal of its sales and sent no information to Jerryco that would allow Jerryco to report Cadco's sales to CAT (Aug. 31 Tr. 61–62, 67; Sept. 16 Tr. 70–73; Sept. 26 Tr. 52–53). Contrary to the express terms of factory subcontract agreements signed by J. Werman on behalf of Jerryco in 1993 (Pltf.Ex. 63), Cadco instructed factory sub-contractors to invoice purchasers for the factory cost of shoes purchased (e.g., Pltf.Ex. 51). Cadco kept no ledger or journal whatsoever of the units or factory cost of goods shipped to purchasers (Sept. 26 Tr. 52–54). When factories shipped goods to customers, Cadco typically sent the purchaser a second invoice for an amount equal to 15% of the factory cost of goods sold (e.g., Pltf.Ex. 51) for "commissions" or "royalties" (Pltf.Ex. 45 ¶ 3(d)). The proceeds of these invoices were never reported to CAT or included in any sales on which royalties were paid to CAT (Sept. 26 Tr. 122).

92. Although not recorded by Cadco on its books, the invoices which Cadco sent to customers for "commissions" or "royalties" included references to correlated factory invoices and factory costs that the customers had been charged (e.g. Pltf.Ex. 51). These cross-references inadvertently left a trail

which CAT was able to follow to discover substantial under-reporting of sales that Werman and J. Werman had caused to happen (Sept. 26 Tr. 122).

93. Cadco's failure to maintain proper sales records or to provide Jerryco with any summary sales records were acts calculated to ensure that Cadco's sales activities would go unreported. J. Werman profited handsomely by this fraudulent scheme (Pltf. 43). Between 1992, when Cadco was formed, and 1993, J. Werman's personal income increased from $124,210 to $567,437 (Pltf. 43).

94. As a matter of law, Cadco cannot avoid liability for royalties due on its sales of CAT footwear because an alleged intermediary, Jerryco, absconded with monies assertedly intended for CAT. "[T]he fact that a principal turned sufficient funds over to its agent to pay the claims of a third party does not release the principal from liability on such claims if the agent fails to satisfy them." *Packet Dairy, Inc. v. Ziegler's Super Market, Inc.,* 676 S.W.2d 926, 928 (Mo.App.1984); 3 C.J.S. Agency § 420 (1973).

95. Under the License, Jerryco was granted a "personal, and nontransferable license to use the Licensed Rights upon and in connection with Licensed Article(s) ... manufactured by or at the direction of LICENSEE worldwide and distributed by LICENSEE for retail and promotional use and ultimate sale...." (Pltf.Ex. 61, ¶ 2.1). Cadco had no right to direct the manufacture of any Licensed Article. Cadco did not have the right to sell any Licensed Article, except as a subsidiary, associate or affiliated company or agency of Jerryco or as first purchased by it from Jerryco (Pltf.Ex. 61 at ¶ 1.3). Contrary to the License, Cadco directly contracted with factories for the manufacture of Licensed Articles and directly invoiced customers for those sales, purchasing no footwear from Jerryco as would have been required by the License and would have resulted in sales showing up in Jerryco's books (Sept. 16 Tr. 68–70; Pltf.Ex. 59, 61). As characterized by J. Werman, Cadco's sales were effectively counterfeit, making Cadco directly liable to CAT for its profits resulting from such sales under 15 U.S.C. § 1117(a).

96. J. Werman and Werman made affirmative efforts to deceive CAT as to the nature of Cadco's relationship with Jerryco under the License. Defendants held Cadco out to CAT as an agent of Jerryco, run as a division of Jerryco (Sept. 16 Tr. 61–62; Sept. 26 Tr. 177–178; Pltf.Exs. 15, 33). J. Werman and Werman knew that the CAT license was personal to Jerryco and that Cadco had no authority to manufacture footwear bearing CAT's trademarks or to sell such footwear except as a sales agent of, and through, Jerryco (Sept. 16 Tr. 56–59, 62; Pltf.Ex. 13, 16, 61). Nevertheless, Werman and J. Werman together decided that Cadco would establish a separate operation and directly invoice its sales of CAT footwear, but never discussed this plan with anyone at CAT (Sept. 16 Tr. 68–69).

97. Defendants Werman and J. Werman also purported to authorize a Taiwanese entity known as Nova International to manufacture and sell CAT footwear in Asia (Sept. 26 Tr. 54). Werman and J. Werman collectively own 50% of Nova (Sept. 16 Tr. 95). Like Cadco's sales of CAT footwear, Nova International's sales were unauthorized and contrary to the express terms of the License. The Nova International sales were not recorded in any books maintained by Cadco or Jerryco (Sept. 26 Tr. 55, 125–126). It was not until the Court's Preliminary Injunction Order of September 2, 1994, that defendants for the first time produced any records from Nova. The Nova records produced by defendants in mid-September 1994 disclosed an additional $8 million which had not previously been disclosed in discovery made by defendants (Pltf.Ex. 50). Royalties due on Nova sales exceeded $400,000 (Sept. 26 Tr. 131; Pltf.Ex. 56).

98. Contrary to movants' assertions, the Preliminary Injunction Order is not an "attachment." The Preliminary Injunction is based on the statutory authority of the UFTA which provides broad relief for creditors injured by fraudulent transfers. 740 ILCS 160/8 allows a court to enjoin "further disposition by the debtor or a transferee, or both, of the asset transferred or of other property" as well as "any other relief the

circumstances may require." 740 ILCS 160/8(a)(3)(A), (C).

99. J. Werman's and Rugged's arguments concerning "corporate veils" and "alter egos" are not relevant. J. Werman and Rugged are *transferees* of property which was transferred in violation of the Illinois Uniform Fraudulent Transfer Act. The "corporate veils" of Cadco or Jerryco are simply irrelevant. The Fifth Circuit held on similar facts that:

> It is not necessary that the corporate "veil" be pierced or even discussed. An officer or any other agent of a corporation may be personally as responsible as the corporation itself for tortious acts when participating in the wrongdoing. *L.C.L. Theatres, Inc. v. Columbia Pictures Industries, Inc.,* 619 F.2d 455, 457 (5th Cir.1980).

In this case, as in *L.C.L. Theatres,* the individual defendants are accused of having personally participated in a "skimming" scheme which was perpetrated by the individual defendants through corporate entities they owned, managed, and controlled. Defendants can not hide behind the corporate veil for these tortious acts they are accused of committing.